[Cite as *In re D.G.*, 2012-Ohio-1818.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: D.G.

C.A. No. 26213

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 09-09-781

DECISION AND JOURNAL ENTRY

Dated: April 25, 2012

CARR, Presiding Judge.

{¶1} Appellant, Debbie G. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to one of her minor children and placed the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother and Christopher B. ("Father") are the natural parents of two minor children, A.B., born April 23, 2007, and D.G., born July 7, 2009. Although Mother, Father, and both children were part of this dependency case at one time, A.B. was later placed in the legal custody of Father and that disposition is not currently at issue. Father voluntarily surrendered his parental rights to D.G. and is not a party to this appeal.

{¶3} After his premature birth at a gestational age of 29 weeks, D.G. had numerous medical problems, including a defective heart valve that required open-heart surgery. In addition

to problems associated with his premature birth, D.G. was diagnosed with Lowe Syndrome, a rare and serious genetic disorder that is associated with physical and mental handicaps as well as persistent medical problems. D.G. will continue to require ongoing medical treatment by a geneticist, an eye doctor, pulmonary and heart specialists, and will also require regular physical and speech therapy to address his developmental delays. Due to his medically fragile condition at birth, D.G. was transferred to Akron Children's Hospital, where he remained for approximately two and one-half months.

{¶4} CSB began a voluntary case plan with Mother shortly after D.G.'s birth. Hospital personnel had expressed concern to CSB that Mother had failed to regularly visit D.G. in the hospital and, consequently, had not received adequate professional instruction about how to provide for his special needs. At that time, Mother also had two-year-old A.B. to care for and appeared to be overwhelmed by the prospect of bringing a medically-fragile infant into her home.

{¶5} The hospital and CSB attempted to assist Mother in preparing to care for D.G. in her home. Despite repeated urging by CSB and hospital personnel that Mother educate herself and prepare her home to meet D.G.'s special needs, Mother made little effort to obtain the necessary training and did not equip her home with the necessary supplies. Shortly before D.G. was scheduled to be released from the hospital, a CSB caseworker visited Mother's home and concluded that Mother was not prepared to meet D.G.'s basic or special medical needs. Consequently, CSB filed a dependency complaint and D.G. was released from the hospital into CSB custody. Several months later, for unrelated reasons, A.B. was also removed from Mother's custody.

{¶6}    Although the reunification goals for both children included Mother addressing her lack of parenting skills and her problems managing her anger and overall mental health, CSB's primary concern about Mother's ability to provide a suitable home for D.G. was her ability to meet his unique medical and developmental needs.  CSB repeatedly emphasized to Mother that it was critical for her to attend visits and medical appointments with D.G. to learn about his serious medical condition and how to provide for his special needs.  Mother rarely attended D.G.'s medical or therapy appointments, however.  She also failed to consistently attend visits with him, where she could receive further parenting assistance from the visitation supervisor.

{¶7}    CSB made repeated appointments for Mother to meet with one of D.G.'s medical specialists, who wanted to fully explain D.G.'s medical condition to her.  Despite her statements beforehand that she would attend each appointment, Mother failed to attend any of the scheduled appointments and never offered an explanation for her failures to attend.

{¶8}    CSB eventually moved for permanent custody of D.G., and Mother alternatively requested that the trial court place him in her legal custody.  Following a hearing on both motions, the trial court found that D.G. had been in the temporary custody of CSB for more than 12 of the prior 22 months and that permanent custody was in his best interest.  Consequently, it terminated Mother's parental rights and placed D.G. in the permanent custody of CSB.  Mother appeals and raises two assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE JUVENILE COURT COMMITTED REVERSIBLE ERROR BY PROCEEDING TO THE PERMANENT CUSTODY TRIAL WHEN MOTHER HAD NOT BEEN PROPERLY SERVED WITH THE PERMANENT CUSTODY COMPLAINT UNDER R.C. 2151.29.

{¶9}    Mother's first assignment of error is that the trial court lacked jurisdiction over her at the permanent custody hearing because she was not properly served with the motion for permanent custody.  R.C. 2151.414(A)(1) requires that notice of the permanent custody hearing be given to "all parties to the action and to the child's guardian ad litem" in accordance with R.C. 2151.29.   Mother argues that she was not served in compliance with R.C. 2151.29 because notice of the permanent custody hearing was sent to her by a certificate of mailing, which was not in compliance with the specific service requirements of R.C. 2151.29.   She does not dispute that she ultimately received notice through her counsel and appeared at the hearing, but maintains that, because notice was not served upon her as set forth in R.C. 2151.29, the trial court did not acquire personal jurisdiction to proceed with the hearing and ultimately terminate her parental rights.

{¶10} Mother relies primarily on this Court's decision in *In re S.S.*, 9th Dist. No. 10CA0010, 2010-Ohio-6374, which vacated a trial court's permanent custody decision because there was nothing in the record to indicate that the mother had been served with the permanent custody motion under a method that was proper under R.C. 2151.29.  This Court's vacation of the termination of parental rights was not based solely on a lack of compliance with R.C. 2159.29 in the manner that service was attempted on the mother, however.  Rather, this Court vacated that permanent custody judgment based on the unique facts of that case.  Specifically, there was nothing in the record to indicate that the mother of S.S. had received notice of the permanent custody hearing: she was not properly served under R.C. 2151.29; she did not appear at the permanent custody hearing; she was not represented by counsel; and there was nothing else in the record to indicate that she had received notice.  Because the record failed to reflect that the mother had been given any notice of the permanent custody hearing, this Court

concluded that the trial court had been without personal jurisdiction to terminate her parental rights.

{¶11} In this case, however, there is no dispute that Mother did receive timely notice of the permanent custody hearing. Unlike the mother in *In re S.S.*, she was represented by counsel throughout these proceedings. This Court explicitly recognized in *In re S.S.* that, had the mother in that case been represented by counsel, the motion could have been served on her counsel. *In re S.S.*, 2010-Ohio-6374, at ¶ 25. Juv.R. 20(B) provides that service of post-complaint notices upon a party represented by counsel "shall be made upon the attorney unless service is ordered by the court upon the party." There was no court order in this case to serve Mother personally. Mother conceded at the hearing that the permanent custody motion had been served on her attorney, who had conveyed timely notice of the hearing to her.

{¶12} Consequently, because Mother was served through her counsel, she has failed to demonstrate that the trial court lacked jurisdiction over her person to proceed with the permanent custody hearing. Mother's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE, AND THAT THE GRANT OF PERMANENT CUSTODY WAS SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother's second assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence presented at the permanent custody hearing. Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the

temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶14} The trial court found that D.G. had been in the temporary custody of CSB for more than twelve months at the time the agency filed its permanent custody motion and Mother does not dispute that finding. Instead, she confines her challenge on appeal to the trial court's finding that permanent custody was in the best interest of D.G. When determining whether a grant of permanent custody is in a child's best interests, the juvenile court must consider the following factors:

> The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ***;

> The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]

R.C. 2151.414(D)(1)(a)-(d).

{¶15} Mother argues that the trial court's best interest finding was against the manifest weight of the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a permanent custody case, this Court reviews the entire record and:

> "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]."

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (10th Dist.1983). Accordingly, before reversing a judgment as being against the manifest weight of the evidence in this context, this Court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *In re M.C.*, 9th Dist. No. 24797, 2009-Ohio-5544, ¶ 8, 17.

{¶16} Throughout D.G.'s life, Mother's interaction with him was limited to visiting him in the hospital, at medical appointments, and during supervised visits after he was placed in foster care. Mother did not regularly attend scheduled visits or appointments, however, so she did not learn how to address his medical needs. During the first two and one-half months of his life, D.G. remained in Akron Children's Hospital and, although Mother was encouraged to spend time with him and his medical providers every day, Mother visited him only six times during that period.

{¶17} After D.G. was released from the hospital, Mother continued to have little involvement in his medical care and therapy. During the first year of his life, Mother attended only "a few" of his medical appointments and only two of his physical therapy appointments. Her involvement during the second year of his life did not show much improvement. At the time of the permanent custody hearing, when D.G. was two years old, Mother admitted that she had not been to any of his appointments for several months and that she had not met with some of his specialists for even longer. Several witnesses expressed concern about Mother's lack of

commitment to D.G.'s medical and developmental needs. Due to her lack of involvement throughout his life, several CSB witnesses expressed doubt that Mother would have the ability and desire to get him to his necessary appointments.

{¶18} In addition to her failure to learn to address D.G.'s medical and developmental problems, Mother made little effort to develop a parent-child relationship with her infant son. She did not visit him regularly during the months that he remained in the hospital and, during the first four months that D.G. was in foster care, Mother attended only 10 of the 23 scheduled visits with him. Three months later, she was terminated from the visitation schedule because she had missed four consecutive visits. According to the caseworker, CSB removed Mother from the visitation schedule multiple times during this case because she had missed three or four consecutive visits with D.G.

{¶19} At the hearing, the only explanation that Mother offered for missing visits with D.G. was that she had another child, A.B., and had no one to babysit her. CSB arranged for child care for A.B., however, and later removed her from Mother's care. Mother's attendance at visits with D.G. remained a problem throughout this case. When Mother did attend visits after A.B. was also in CSB custody, she visited both her children at the same time and tended to devote much more attention to A.B. than to D.G. Consequently, Mother never developed a parent-child bond with D.G. One of the caseworkers observed that D.G. did not cuddle with Mother and did not go to her when he needed help during a visit, but instead he would approach the caseworker.

{¶20} Mother testified that she had missed most of D.G.'s medical and therapy appointments because they were in Cleveland and she had no means of transportation. The caseworker later testified, however, that all of D.G.'s medical and therapy appointments were in Akron. Even though the foster mother lived closer to Cleveland than Akron, CSB had insisted

that D.G. continue with his medical and therapy providers in Akron, so Mother would be able to attend the appointments. The caseworker further testified that Mother lived near a bus route and that CSB had provided her with bus passes, as had Children's Hospital.

{¶21} Because Mother had not attended most of D.G.'s appointments with his doctors and therapists, she knew very little about his health problems or how to care for him. As a newborn infant, D.G. once stopped breathing while Mother was visiting him at the hospital. Mother did not recognize that he was in distress and did nothing to assist him or get him help. Because hospital staff heard alarms sounding, they responded and were able to resuscitate him. Given her failure to obtain the necessary training or demonstrate any ability to meet D.G.'s unique medical needs, CSB cross-examined Mother about how she would be able to identify and respond to a similar emergency in the future. Mother's response only demonstrated her lack of understanding about the significance of D.G.'s special medical needs. She testified that, if D.G. were returned to her care, she would know when he needed immediate medical attention because he would "probably [be] crying" and if he were "just walking around crying constantly," she would take him to the hospital.

{¶22} CSB's cross-examination of Mother gave numerous examples of how little Mother knew about D.G.'s special needs. She was not able to explain the nature of D.G.'s past medical or developmental problems, nor could she describe his condition at the time of the hearing. Mother could not identify any of D.G.'s medical providers by name or specialty, nor could she describe any of the surgeries that had been performed on him or the medical problems that had necessitated each surgery. When counsel for CSB asked Mother about how to feed D.G., Mother simply repeated some of the instructions that she had been given by the foster

mother, but she could not explain what any of the words actually meant. Mother conceded that she did not know how to prepare D.G.'s food and would need assistance from others.

{¶23} On the other hand, all of D.G.'s basic and special needs were being met in the home of the foster mother, who is a registered nurse and had received training as a foster parent of medically fragile children. The caseworker testified that the foster mother had done an "excellent job" with D.G. and had "brought him a long way." She further explained that the foster mother had a strong family support system to assist her with D.G. and that she was interested in adopting him if Mother's parental rights were terminated. A.B. had lived in the same home with D.G. while she was in foster care and, after she was placed in the legal custody of Father, the foster mother and Father had arranged to continue the relationship between the two siblings.

{¶24} Because D.G. was only two years old at the time of the permanent custody hearing, the guardian ad litem spoke on his behalf. She believed that permanent custody was in his best interest because, as the evidence had strongly demonstrated, Mother lacked the dedication or ability to meet D.G.'s special needs. The guardian further testified that she did not believe that a bond had developed between Mother and D.G. She emphasized that D.G. was thriving in the foster home and that the foster mother was meeting all of his needs.

{¶25} D.G. has never lived in Mother's custody, and has spent very little time with her during the first two years of his life. He has spent most of his life in foster care, where he had been placed in the same stable home and all of his needs were being met on a consistent basis. D.G. had spent his entire two-year life in a temporary placement, however, and was in need of a legally secure permanent placement.

**{¶26}** The trial court reasonably concluded that permanent custody to CSB was the only way that it could achieve a legally secure permanent placement for D.G. CSB had been unable to find any suitable relatives who were able to provide a permanent home for D.G., and Mother was not able to give him a stable and secure home at that time. The foster mother, on the other hand, was interested in adopting D.G. if CSB received permanent custody.

**{¶27}** The trial court had substantial evidence before it from which it could conclude that permanent custody was in D.G.'s best interest. Therefore, the trial court did not lose its way in granting CSB's motion for permanent custody and terminating Mother's parental rights to D.G. Mother's second assignment of error is overruled.

III.

**{¶28}** Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

DICKINSON, J.
CONCURS.

BELFANCE, J.
CONCURRING IN JUDGMENT ONLY.

{¶29} I concur in the majority's judgment. R.C. 2151.414(A)(1) requires that, after a motion for permanent custody has been filed, the juvenile court schedule a hearing and give all of the parties notice of the filing and hearing in the manner required by R.C. 2151.29. The clear purpose of R.C. 2151.414(A)(1) and R.C. 2151.29 is to ensure that the important relationship between parents and their children is not terminated without due process. The trial court is obligated to comply with the requirements of the statute. Nevertheless, the error is not jurisdictional. Thus, assuming that Mother did not receive notice in the manner provided for in R.C. 2151.29, she has not explained how she was prejudiced, and, therefore, her first assignment of error is properly overruled. *See* Civ.R. 61(A).

APPEARANCES:

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.